

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| IN THE INTEREST OF J.P.B. | ) | *Opinion issued January 5, 2017* |
| | ) | |
| M.R.S., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. SC95602 |
| | ) | |
| GREENE COUNTY JUVENILE OFFICE, | ) | |
| | ) | |
| Respondent. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY
### The Honorable Andy Hosmer, Judge

M.R.S. ("Father") appeals from the circuit court's judgment terminating his parental rights to his child, J.P.B. ("Child").  The circuit court found that Father neglected Child, failed to rectify conditions that led to Child coming into the care of the Children's Division, was unfit to be a party to the parent-child relationship, and that termination was in the best interest of Child.  The circuit court's judgment is affirmed.

## I.  Factual and Procedural History

Father has been incarcerated since July 2013.  He pleaded guilty to driving while intoxicated (as a chronic offender), second-degree attempted assault of a law enforcement officer, resisting arrest, and two counts of third-degree assault.  He has a conditional release date of November 14, 2018, and a maximum release date of July 14, 2021.  Child was born

in February 2014 and came to the attention of the Children's Division shortly thereafter due to a report that Child's mother attempted to sell Child. The Children's Division took temporary legal custody and placed Child in a foster home. With respect to Father, the circuit court held an adjudication hearing, declared Father to be the biological father based on paternity testing, found Child could not be returned home due to Father's incarceration, criminal history, and substance abuse issues, and, on November 12, 2014, ordered an incarcerated parent treatment plan.

The juvenile officer filed a petition to terminate the parental rights of both of Child's natural parents on July 2, 2015. Father subsequently filed a motion to place Child with Child's paternal grandmother and requested that he be permitted visitation in the prison.[1] He also filed a writ of habeas corpus ad testificandum, requesting that he be allowed to appear in person at the trial concerning the termination of his parental rights. The circuit court denied Father's request to appear in person, but allowed him to participate via videoconference. The day before trial, Father filed a motion for continuance on the basis that the circuit court had yet to rule on his motion for placement with the grandmother. The next day, the circuit court overruled Father's motion for continuance and motion for placement of Child with the grandmother. After being given a short recess to review the circuit court's findings and conclusions on the motion for placement, Father filed an application for change of judge on the basis that the denial of the motion for placement

---

[1] Father requested in-person visitation with Child in July 2015 and September 2015, but the circuit court denied these requests, citing the long distance Child would have to travel. The foster home was located in Springfield, and Father was incarcerated in St. Joseph. Father did not seek any review from a higher court (e.g., a writ) of the circuit court's denial of in-person visitation.

indicated the judge had prejudged the matter of termination. The circuit court denied this application.

At trial, the Children's Division case manager for Child testified that each month Father sent $2 for support, as well as two or three letters, but that Father had never met Child in person and that Child had no emotional ties to Father.[2] She testified that Father had told her he attended weekly meetings to address his substance abuse, but provided no written confirmation of such. She also testified that she could not think of any additional services that could be offered to change Father's circumstances to a point of having Child returned to him within an ascertainable period of time, or any services that could create a bond between Father and Child. The case manager further testified that Child was doing well in the foster home and called the foster parents "mom" and "dad." Father testified that he wanted Child placed with Child's paternal grandmother. Both the case manager and Child's guardian ad litem recommended that Father's parental rights be terminated.

Following trial, the circuit court entered a judgment terminating both parents' parental rights in accordance with § 211.447.6.[3] The circuit court found that termination

---

[2] "The court may attach little or no weight to infrequent visitations, communications, or contributions. It is irrelevant in a termination proceeding that the maintenance of the parent-child relationship may serve as an inducement for the parent's rehabilitation." Section 211.447.8. Statutory citations for § 211.447 are to RSMo Noncum. Supp. 2014 unless otherwise noted. All other statutory citations are to RSMo 2000.

[3] Section 211.447.6 provides:

> The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer or the division . . . if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 4 or 5 of this section.

3

was in the best interest of Child and, with respect to Father, found three separate grounds for termination: that Father neglected Child pursuant to § 211.447.5(2); that Father failed to rectify conditions that led to Child coming into care pursuant to § 211.447.5(3); and that Father was unfit to be a party to the parent-child relationship pursuant to § 211.447.5(6)(a). On appeal, Father challenges the constitutional validity of § 211.447.5(6)(a), the circuit court's finding on each ground for termination, the circuit court's finding that termination was in the best interest of Child, and the circuit court's rulings on his procedural requests. Because Father's appeal involves the constitutional validity of a Missouri statute, this Court has exclusive appellate jurisdiction pursuant to article 5, § 3 of the Missouri Constitution.

## II. Father's Challenge to the Constitutional Validity of § 211.447.5(6)(a)

Father argues § 211.447.5(6)(a) is unconstitutionally vague as applied to his case because the circuit court's determination that he was unfit to be a party to the parent-child relationship is "inextricably tied to his incarceration" and § 211.447.7(6) "explicitly provides that incarceration alone shall not be grounds for termination of parental rights." Father argues that, to the extent § 211.447.5(6)(a) "can be read to equate incarceration with parental unfitness, it is unconstitutionally vague and thus, void."

"The standard for determining whether a statute is void for vagueness is whether the terms or words used are of common usage and are understandable by persons of ordinary intelligence." *Bd. of Educ. of City of St. Louis v. State*, 47 S.W.3d 366, 369 (Mo. banc 2001) (internal quotations omitted). Section 211.447.7 states:

4

**When considering whether to terminate the parent-child relationship pursuant to subsection 2 or 4 of this section or subdivision (1), (2), (3) or (4) of subsection 5 of this section**, the court shall evaluate and make findings on the following factors, when appropriate and applicable to the case . . . (6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights[.]

(emphasis added). By the statute's plain terms, subdivision (6) of § 211.447.7 applies only to termination that is pursuant to certain subsections or subdivisions. Section 211.447.5(6)(a) is not included. Even if the circuit court's finding pursuant to § 211.447.5(6)(a) were "inextricably tied" to Father's incarceration, there is nothing vague about the lack of applicability of § 211.447.7(6) to termination that is pursuant to § 211.447.5(6)(a). Father's challenge on vagueness is wholly without merit.

### III. Father's Challenges to the Circuit Court's Findings

For each of the three grounds for termination found by the circuit court, Father argues the circuit court's finding is not supported by substantial evidence and is against the weight of the evidence.[4] In reviewing termination of parental rights cases, like all types of bench-tried cases, this Court is mindful "that circuit courts are better positioned to determine witness credibility and weigh evidence in the context of the whole record than an appellate court." *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 626 (Mo. banc 2014). As previously explained by this Court:

This Court reviews whether clear, cogent, and convincing evidence was presented to support a statutory ground for terminating parental rights under *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Therefore, the trial

---

[4] Father's brief properly presented the distinct legal claims of "not supported by substantial evidence" and "against the weight of the evidence" by raising them in separate points relied on.

5

court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. The judgment will be reversed only if we are left with a firm belief that the order is wrong.

Conflicting evidence will be reviewed in the light most favorable to the trial court's judgment. Appellate courts will defer to the trial court's credibility assessments. When the evidence poses two reasonable but different inferences, this Court is obligated to defer to the trial court's assessment of the evidence.
. . .

After this Court determines that one or more statutory ground has been proven by clear, convincing, and cogent evidence, this Court must ask whether termination of parental rights was in the best interest of the child. At the trial level, the standard of proof for this best interest inquiry is a preponderance of the evidence; on appeal, the standard of review is abuse of discretion.

*Id.* (quoting *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 815–16 (Mo. banc 2011)). This Court has "laid to rest any argument that the 'clear, cogent, and convincing' burden of proof requires this Court to consider any contrary evidence when reviewing whether the judgment is supported by substantial evidence." *Id.* at 626 n.4.

"In reviewing questions of fact, the reviewing court is to recognize that the circuit court is free to disbelieve any, all, or none of the evidence, and it is not the reviewing appellate court's role to re-evaluate the evidence through its own perspective." *Id.* at 627. "The trial court receives deference on factual issues because it is in a better position not only to judge the credibility of the witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record." *Id.* (internal quotations omitted).

## A. Failure to Rectify Harmful Conditions

A parent's failure to rectify the conditions that led to a child coming into care is a ground for termination pursuant to § 211.447.5(3) when the following three elements are present: (1) "[t]he child has been under the jurisdiction of the juvenile court for a period of one year;" (2) "the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist;" and (3) "there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home."  When determining whether to terminate pursuant to § 211.447.5(3), a circuit court is required to consider and make findings regarding certain factors:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

Here, the circuit court found all three elements necessary for termination pursuant to § 211.447.5(3).  The relevant "conditions" found by the circuit court were the following:

7

the continuing neglect by Father; the inability of Father to care appropriately for Child; Father's failure to engage in services; Father's failure to provide a safe, stable, and healthy home environment; and Father's substance abuse issues.[5]  The circuit court also made specific findings as required by § 211.447.5(3) and, relevant to subdivision (d), found that Father had a chemical dependency to alcohol that could not be treated.[6]

---

[5]  In full, the circuit court's finding stated:

> The minor child has been under the jurisdiction of the Court for more than one year and the conditions that led to the assumption of jurisdiction or conditions of a potentially harmful nature continue to exist and there is little likelihood that those conditions can be remedied at an early date so that the child could be returned to the mother or the father in the near future.  Those conditions include the continuing neglect by the mother and the father, the inability and/or unwillingness of the mother and the father to provide the child with appropriate care and parenting, the mother's and father's failure or refusal to engage in services, the mother's failure and the father's failure to provide the child with a safe, stable, and healthy home environment, and the mother's and the father's substance abuse issues. Continuation of the parent-child relationship between the mother and the child greatly diminishes the child's prospects for early integration into a stable and permanent home.  Continuation of the parent-child relationship between the father and the child greatly diminishes the child's prospects for early integration into a stable and permanent home.

[6]  The dissent states that "the evidence does not show substance abuse since [Father's] incarceration or that such abuse cannot be treated."  In addition to other evidence, the record established that Father was sentenced as a chronic offender for driving while intoxicated, which may be evidence of an untreatable chemical dependency.  The circuit court found:

> Based upon clear, cogent, and convincing evidence, the Court finds that father has a significant history of having a chemical dependency to alcohol and controlled substances as demonstrated by his pleas of guilty and convictions for the Class B felony of driving while intoxicated, as a chronic offender, and the Class C felony of possession of a controlled substance. The Court finds further that the father's chemical dependency and criminal activity have resulted in his absence from the child.  The Court finds that father does not have a period of sobriety long enough to convince this court that the child would be safe in his care.
>
> The case manager testified that the father told her that he had been attending AA and NA meetings while in prison. The Court finds this testimony to be less than credible.  No documentary evidence was presented which would establish that the father is attending or has attended alcohol and drug treatment support groups.  The

8

Father argues the circuit court's decision to terminate pursuant to § 211.447.5(3) is not supported by substantial evidence because his past criminal convictions involving alcohol were insufficient evidence to support a finding that he has an untreatable chemical dependency. Father's argument is premised on a misunderstanding of the statutory scheme, as he suggests that "[t]o establish grounds for termination of parental rights under [§ 211.447.5(3)], clear, cogent and convincing evidence of at least one factor listed in subsection (a)-(d) must be presented to the trial court." As previously explained by this Court, there is no statutory requirement that a factor listed under a ground for termination be proven by "clear, cogent and convincing evidence;" rather, that burden of proof applies to the ground for termination. *See In re B.H.*, 348 S.W.3d 770, 774 (Mo. banc 2011); *see also* § 211.447.6. The factors listed in § 211.447.5(3)(a)–(d), including the existence of a chemical dependency, are just that—factors the circuit court must consider. But nothing in the statute says that parental rights may be terminated only when there is a finding on one of the listed factors that is supported by clear, cogent, and convincing evidence.

case manager testified that the father had not provided information that would demonstrate that he has addressed his chemical dependency successfully. The father's testimony was void of any remorse for his use and abuse of alcohol and controlled substances which contributed substantially to his incarceration. Based upon all of the evidence, the Court finds that the father's imposed abstinence while incarcerated is not an accurate indicator of the father's future behavior regarding his substance abuse and chemical dependency.

The Court finds that father has a chemical dependency to alcohol and controlled substances which prevents father from consistently providing the child with necessary care, custody, and control. The Court finds further that father's chemical dependency cannot be treated, because father has not taken any significant, positive, consistent steps to treat his chemical dependency successfully in drug treatment services.

9

Instead, parental rights may be terminated only when there is *a ground for termination* that is supported by clear, cogent, and convincing evidence. Section 211.447.6. For § 211.447.5(3), the ground for termination is defined by the three elements discussed above. Those three elements may exist independently and in the absence of any evidence regarding the listed factors. Accordingly, the relevant question before this Court is not whether there was substantial evidence to support the circuit court's finding that Father has an untreatable chemical dependency. The relevant question is whether there was substantial evidence to support a finding of the three required elements of § 211.447.5(3).

Substantial evidence supported a finding of all three elements in this case. The first two elements were present because, at the time of the circuit court's judgment, Child had been under the jurisdiction of the juvenile division for more than one year and Father, being incarcerated, was unable to care appropriately for Child or provide Child with a safe, stable, and healthy home environment. Therefore, "conditions of a potentially harmful nature continue[d] to exist." Section 211.447.5(3). Regarding the third factor, Father will be incarcerated until at least November 2018, or at least 33 more months from the time of the circuit court's judgment.[7] This means that Father's inability to care appropriately for Child—whom he has never met and with whom he has no parent-child bond—or provide Child with any kind of a home will continue at least until Child is nearly five years old. Meanwhile, Child has lived with foster parents since Child was only three months old and has developed a close familial bond with that family. These circumstances support both a

---

[7] As noted, Father has a conditional release date of November 14, 2018, and a maximum release date of July 14, 2021.

10

finding that "there is little likelihood that [the harmful] conditions will be remedied at an **early date**" and a finding that "continuation of the parent-child relationship greatly diminishes the child's prospects for **early integration into a stable and permanent home**." Section 211.447.5(3) (emphasis added). Therefore, even if there were not substantial evidence to support a finding that Father has an untreatable chemical dependency, there was nonetheless substantial evidence to support termination pursuant to § 211.447.5(3).[8] The fact that Father has participated in the court-ordered treatment plan and sent correspondence and minor contributions to Child is not sufficient to bar termination. *See C.V.E. v. Greene Cnty. Juvenile Office*, 330 S.W.3d 560, 570–71 (Mo. App. 2010). Section 211.447.5(3) makes no exception for a parent who wants, but is unable, to rectify the harmful conditions.[9]

Father also argues the circuit court's decision to terminate his parental rights pursuant to § 211.447.5(3) is against the weight of the evidence in that Father suggested a relative, Child's grandmother, who was fit and willing to provide the necessary care for Child while Father is incarcerated. The dissent's argument is likewise predicated on the

---

[8] This conclusion does not run afoul of § 211.447.7(6)'s directive that "incarceration in and of itself shall not be grounds for termination of parental rights" when considering termination pursuant to § 211.447.5(3). A court may still terminate parental rights when a ground for termination exists due to the duration of incarceration and the consequences of such duration. That is not termination based on "incarceration in and of itself." Here, the circuit court found: "The father has been incarcerated since before the child was born. The father is not eligible for parole until November of 2018. The child has been under juvenile court jurisdiction for most of his young life. The child needs permanency now." This finding in support of termination goes to the duration of Father's incarceration and the impact of such duration on an infant who has lived most of his life with a foster family.

[9] The dissent is also factually incorrect in asserting "the record shows [Father] made all reasonable attempts to obtain visitation." As noted, Father sought no review (e.g., a writ) of the circuit court's denial of in-person visitation.

grandmother's ability to provide the necessary care for Child. At the time of the circuit court's judgment, though, the circuit court had already overruled Father's motion for placement of Child with the grandmother, finding that such placement was contrary to the best interest of Child. In other words, *before* the circuit court determined there was a ground for termination and *before* the circuit court determined termination was in the best interest of Child, the circuit court had already determined Child would not be placed with the grandmother. On appeal, Father does not directly challenge the circuit court's ruling on his motion for placement with the grandmother. That is, Father makes no argument that the circuit court abused its discretion in denying placement with the grandmother. Essentially, then, both Father's and the dissent's argument is that the circuit court should have considered the ability of the grandmother to care for Child even though Child was not to be placed with the grandmother anyway. This is illogical—evidence of the grandmother's ability to provide the necessary care for Child was irrelevant when considering termination pursuant to § 211.447.5(3) because placement with the grandmother was no longer an option. Though the dissent may disagree with the circuit court's ruling on placement, that ruling is most notably not a subject of Father's appeal.[10]

---

[10] The dissent argues Father could not have challenged the ruling on placement in his appeal of the termination case because the ruling on placement was made in the custody case. But the question of whether Father, under these particular circumstances, could have challenged the ruling on placement in this appeal is not before this Court because no such challenge was made. And this Court need not answer the question because the fact remains that both Father's and the dissent's argument would require this Court to impermissibly presume an unchallenged ruling was incorrect.

## B. Unfit to be a Party to the Parent-Child Relationship

Although this Court may affirm on only one ground, termination was also appropriate pursuant to § 211.447.5(6)(a), which provides for termination when:

> The parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse including, but not limited to, specific conditions directly relating to the parent and child relationship which are determined by the court to be of a duration or nature that renders the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of the child.

The circuit court's finding on this ground was based on the lack of contact and bond between Father and Child and "Father's volitional criminal activity" that resulted in incarceration.[11]

---

[11] In full, the circuit court's finding stated:

> Based upon clear, cogent, and convincing evidence, the Court finds that the father is unfit pursuant to Section 211.447.5(6)(a) RSMo., due to specific conditions directly relating to the parent and child relationship that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child. Based upon all of the evidence, the Court finds that the father has been incarcerated during all of the child's lifetime. The father has not had any physical contact with the child. The child does not know who the father is and the child does not have a bond with the father. The father has sent correspondence to the child consistently; however, this effort to establish a bond between the father and the child has been unsuccessful. Father's volitional criminal activity caused father to go to prison. The child has been in the same foster home since the child came under juvenile court jurisdiction in May of 2014. The child views his foster parents as his parents and calls them "mom" and "dad". The Court previously denied the paternal grandmother's request for placement because such a placement was contrary to the best interest of the child. The Court finds that the nurturing of a bond between the child and the father would take too long, if such a bond could be established at all. All of these conditions render the father unable, for the reasonably foreseeable future, to care appropriately for the physical, mental, and emotional needs of the child.

13

Father argues the circuit court's finding pursuant to § 211.447.5(6)(a) is not supported by substantial evidence because there was no evidence of "specific abuse," insofar as "abuse" is defined in Chapter 210 as "any physical injury, sexual abuse, or emotional abuse inflicted on a child other than by accidental means by those responsible for the child's care, custody, and control[.]" Section 210.110(1). However, the definition of "abuse" on which Father's argument relies does not apply here. For purposes of § 211.447.5(6)(a), the General Assembly has chosen to define a "consistent pattern of committing a specific abuse" to include "specific conditions directly relating to the parent and child relationship which are determined by the court to be of a duration or nature that renders the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of the child." This definition, expressly provided in this context, supersedes any other definition when applying § 211.447.5(6)(a). *See State ex rel. Jackson v. Dolan*, 398 S.W.3d 472, 479 (Mo. banc 2013).

The dissent likewise refuses to accept that the General Assembly could have intended a "consistent pattern of committing a specific abuse" to mean anything other than traditional forms of abuse. Prior to a 2014 amendment, § 211.447.5(6) read:

> The parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse, including but not limited to abuses as defined in section 455.010, child abuse or drug abuse before the child **or of specific conditions** directly relating to the parent and child relationship **either of which** are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child.

14

RSMo Supp. 2013 (emphasis added).  As the court of appeals has aptly explained:

> The [2014] amendment deleted the phrase "abuses as defined in section 455.010, child abuse or drug abuse before the child or of;" deleted the phrase "either of;" but kept the phrase "including, but not limited to." Plainly read, **the amendment now expresses a clear and unambiguous legislative intent to treat "specific conditions** directly relating to the parent and child relationship which are determined by the court to be of a duration or nature that renders the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of the child" **as a non-exclusive example of "a consistent pattern of committing a specific abuse."**

*Interest of E.B.R. v. E.R.*, WD79507, 2016 WL 6440419, at \*4 (Mo. App. Nov. 1, 2016) (emphasis added) (internal footnote omitted).

"Specific conditions," as used in § 211.447.5(6)(a), may include conditions that result from incarceration.  *See In re C.S.*, 351 S.W.3d 264, 267–68 (Mo. App. 2011).  As discussed, Father's volitional criminal activity has resulted in his incarceration until at least November 2018.  At the time of the circuit court's judgment, Child was two years old, Father had been incarcerated for the entirety of Child's life, and Father would continue to be incarcerated for at least 33 more months.  Therefore, even if visitation had been allowed previously and were allowed in the interim, it could be reasonably inferred that "specific conditions" rendered Father unable to care appropriately for Child's physical, mental, or emotional needs until Child would be nearly five years old.  Considering the limited contact Father would have with Child for the first five years of Child's life, it could further be reasonably inferred that Father would be unable to care appropriately for Child for an additional period, if ever, following his release.  *See In re C.S.*, 351 S.W.3d at 268 ("Upon his release from prison, Father would have to begin working on his parenting skills and

15

would have to begin the process of both establishing a bond with children who have grown up without him and of making a home for them. As the trial court noted, this is a process that could take years."). Giving due consideration to Child's infancy, November 2018— and likely beyond—amounts to the "reasonably foreseeable future." *See id.* As such, there was substantial evidence to support the circuit court's finding pursuant to § 211.447.5(6)(a), and Father's argument pertaining to a lack of evidence on the types of abuse described in § 210.110 is misplaced.

The dissent suggests that the protection provided by § 211.447.7(6)'s directive that "incarceration in and of itself shall not be grounds for termination" "would be worthless if incarceration itself provides a separate basis for termination under a different subsection." As discussed, § 211.447.7(6) does not apply to termination that is pursuant to § 211.447.5(6)(a). Nevertheless, incarceration in and of itself cannot serve as a basis for termination pursuant to § 211.447.5(6)(a) because incarceration in and of itself does not render a parent unable to care appropriately for a child for the reasonably foreseeable future. Rather, it is the *duration* of incarceration and the impact of such duration when considering all relevant circumstances, including the child's age, that may render a parent unable to care appropriately for the child for the reasonably foreseeable future. *See In re C.S.*, 351 S.W.3d at 267–68. Such is the case here. Termination of Father's parental rights pursuant to § 211.447.5(6)(a) is not justified by his mere incarceration, but is justified by the duration of his incarceration when considering the infancy of Child.

As he does with § 211.447.5(3), Father additionally argues the circuit court's finding pursuant to § 211.447.5(6)(a) is against the weight of the evidence because Father

16

suggested a relative, Child's grandmother, who was fit and willing to provide the necessary care for Child while Father is incarcerated. The dissent suggests the same. As discussed above, the circuit court had already overruled Father's motion for placement of Child with the grandmother, finding that such placement was contrary to the best interest of Child. Moreover, § 211.447.5(6)(a) is expressly concerned with the fitness of the parent to care appropriately for the child, not the fitness of any of the parent's relatives. Father does not argue there was persuasive evidence proving his fitness.

## C. Best Interest of Child

In addition to challenging the grounds-for-termination findings, Father argues the circuit court abused its discretion in finding termination was in Child's best interest because Father's visitation requests were denied and he had suggested a relative who was fit and willing to provide the necessary care for Child while Father is incarcerated. "A trial court abuses its discretion when a ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *In re H.L.L.*, 179 S.W.3d 894, 896–97 (Mo. banc 2005). Father's argument does not explain why the circuit court's best-interest finding meets this standard;[12] he simply "ignores the testimony and evidence favorable to the circuit court's

---

[12] The circuit court found that Child had no emotional ties to Father but had a child-parent relationship with his foster parents, that no additional services could be provided that would establish a bond between Father and Child, that Father's testimony indicated he was more committed to his own interests than Child's, that Father's motion for placement of Child with the grandmother had been overruled because placement with the grandmother was contrary to the best interest of Child, that Father has been incarcerated since before Child was born and would not be eligible for parole until November 2018, and that Child was in need of a permanent home now.

17

findings and conclusions and merely recites evidence and purported inferences favorable to his position." *J.A.R.*, 426 S.W.3d at 632. Accordingly, Father's challenge to the circuit court's best-interest finding is "of no analytical or persuasive value." *Id.*

## IV. Father's Challenges to Procedural Rulings

### A. Request to Appear at Trial in Person

Father first claims the circuit court's denial of his request to appear at trial in person deprived him of his constitutional right to due process. Father argues that an incarcerated parent has a right to attend a termination hearing. This is incorrect. There is no constitutional right to appear in person at a civil trial. *Call v. Heard*, 925 S.W.2d 840, 846 (Mo. banc 1996). There is also no statutory right. Although § 491.230.2(1) allows an incarcerated parent to seek a writ of habeas corpus ad testificandum to appear and attend a trial on termination of the person's parental rights, an incarcerated parent does not have an unequivocal right to such writ upon request. Issuing the writ is within the discretion of the circuit court. *Beckwith v. Giles*, 32 S.W.3d 659, 663 (Mo. App. 2000). Father also argues his right to effective assistance of counsel was compromised because he "could not give real-time feedback to his counsel as testimony was being presented." Father has no constitutional right to counsel in this context but, pursuant to § 211.462.2, a natural parent has a statutory right to counsel in a termination of parental rights proceeding and, therefore, an implied right to effective assistance of counsel. *C.V.E.*, 330 S.W.3d at 574. However, a parent's inability to assist counsel at trial does not render counsel's assistance ineffective. *In re W.J.S.M.*, 231 S.W.3d 278, 283–84 (Mo. App. 2007).

18

Father also states that he was unable to have private conversations with his counsel during trial due to the presence of Department of Corrections personnel while Father communicated via videoconference. He provides no authority or explanation beyond his mere conclusion as to why this deprived him of due process. "Where a party fails to support a contention with relevant authority or argument beyond conclusions, the point is considered abandoned." *Beatty v. State Tax Comm'n*, 912 S.W.2d 492, 498–99 (Mo. banc 1995). The argument section of Father's brief makes a passing reference to his inability to communicate confidentially with counsel during trial and then immediately proceeds to mention his inability to give real-time feedback during trial. Considering his point relied on argues his inability to give real-time feedback during trial infringed upon his right to effective assistance of counsel, the most that could be generously gleaned from Father's brief is that he is arguing his inability to communicate confidentially with counsel during trial likewise infringed upon his right to effective assistance of counsel. But a parent does not have to be able to communicate at all with counsel during trial, let alone confidentially, for counsel to be effective. *See In re W.J.S.M.*, 231 S.W.3d at 283. "The test is whether the attorney was effective in providing his client with a meaningful hearing based on the record." *Id.* at 283–84. Although the dissent attempts to supply a different argument for Father by suggesting he was denied his constitutional right to access the courts pursuant to article I, § 14 of the Missouri Constitution, Father has never claimed a violation of his constitutional right to access the courts, and the dissent's theory is not before this Court on appeal. *See Mayes v. Saint Luke's Hosp. of Kansas City*, 430 S.W.3d 260, 266 (Mo. banc 2014).

## B. Motion for Continuance

Father next challenges the circuit court's denial of his motion for continuance on the day of trial. "A decision to grant a continuance is within the sound discretion of the trial court." *Call*, 925 S.W.2d at 846. Father argues the circuit court abused its discretion because he could not effectively prepare for trial without knowing how the circuit court would rule on his motion for placement with the grandmother. After being continued twice, trial was not held until nearly three months after Father filed his motion for placement. Even if it were accepted that Father's strategy at trial depended on how the circuit court ruled on his motion for placement, Father had ample time to prepare for both contingencies. The circuit court did not abuse its discretion in denying Father's motion for continuance.

## C. Application for Change of Judge

Finally, Father challenges the circuit court's denial of his application for a change of judge. Father does not argue that he was entitled to a change of judge without cause pursuant to Rule 121.02, but rather that the judge should have recused pursuant to Rule 121.01, which provides: "A judicial officer shall recuse when the judicial officer is interested, related to a party, has been counsel for a party in any proceeding, or is recused for any other reason." Rule 2-2.11(A) directs that a judge shall recuse "in any proceeding in which the judge's impartiality might reasonably be questioned." Father argues there was reason to question the impartiality of the judge assigned to his termination trial because the same judge overruled his motion for placement with the grandmother. Such a circumstance

does not require recusal.  "Rulings against a party do not establish bias or prejudice on the part of a trial judge." *In re Marriage of Maupin*, 829 S.W.2d 125, 127 (Mo. App. 1992).

## V.  Conclusion

The circuit court's judgment is affirmed.

_____
Zel M. Fischer, Judge

Wilson and Russell, JJ., concur;
Breckenridge, C.J., concurs in result in separate opinion filed;
Stith, J., dissents in separate opinion filed;
Draper, J., concurs in opinion of Stith, J.



# SUPREME COURT OF MISSOURI
## en banc

IN THE INTEREST OF J.P.B.       )
      )
M.R.S.,       )
      )
      Appellant,       )
      )
v.       )     No. SC95602
      )
GREENE COUNTY JUVENILE OFFICE,       )
      )
      Respondent.       )

## OPINION CONCURRING IN THE RESULT

I concur with the principal opinion that there was substantial evidence to support the juvenile court's finding that termination of Father's parental rights was appropriate pursuant to section 211.447.5(3).[1] I disagree, however, with portions of the principal opinion's analysis of Father's failure to rectify the conditions that led to the juvenile court assuming jurisdiction over Child.

Section 211.447.5(3) permits termination of parental rights when a parent fails to rectify the conditions that led to the juvenile court assuming jurisdiction over the child. Failure to rectify constitutes grounds for termination when: (1) "[t]he child had been under the jurisdiction of the juvenile court for a period of one year"; (2) the court finds that

---

[1] All statutory citations are to RSMo Supp. 2014 unless otherwise noted.

(a) "the conditions which led to the assumption of jurisdiction still persist" or (b) "conditions of a potentially harmful nature continue to exist"; and (3) that (a) "there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future" or (b) "the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home." Section 211.447.5(3).

It is undisputed that Child has been under the juvenile court's jurisdiction for at least one year. The issue, therefore, is whether there is substantial evidence to support a finding of the second and third elements of section 211.447.5(3).

The juvenile court found that the conditions that led to the assumption of jurisdiction over Child or conditions of a potentially harmful nature continue to exist. The juvenile court found those conditions to specifically include Father's inability to provide Child with appropriate care and parenting, his failure to engage in services, his failure to provide Child with a safe, stable, and healthy home environment, and his substance abuse issues.

The record reflects that the conditions that led to the assumption of the juvenile court's jurisdiction still persist. In its abuse and neglect judgment against Father, the juvenile court found that Child could not be returned to the home because of Father's incarceration, criminal history, and substance abuse issues. At the time of the termination proceedings, Father was incarcerated in the department of corrections after he pleaded guilty to the class B felony of driving while intoxicated and was sentenced as a prior, persistent, and chronic offender. Father has a previous felony conviction for possession of a controlled substance for which he also served time in the department of corrections and

2

multiple other convictions for driving while intoxicated. At the termination hearing, the caseworker testified that Father was then incarcerated for an alcohol-related felony offense in addition to resisting arrest and assault convictions. She further testified that Father informed her that he was attending weekly Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings but that he had not provided any written verification that he was successfully addressing his substance abuse issues.

On appeal, Father asserts that there was no evidence in the record to support the juvenile court's findings with respect to his substance abuse issues because there was no evidence that his chemical dependency was untreatable. As reasoned by the principal opinion, however, it is not reversible error even if there is not substantial evidence to support the juvenile court's finding that Father's chemical dependency is untreatable. Whether a chemical dependency is treatable and other such factors that the juvenile court must consider pursuant to section 211.447.5(3)(a)-(d) need not be established by clear, cogent and convincing evidence. *See In re B.H.*, 348 S.W.3d 770, 774 (Mo. banc 2011). Instead, this Court must examine whether the conditions that led to the assumption of the juvenile court's jurisdiction still persist.

A parent's past conduct "may be good evidence of future behavior" so long as it is "convincingly linked." *In re Q.A.H.*, 426 S.W.3d 7, 14 (Mo. banc 2014) (internal quotation omitted). As the juvenile court reasoned, despite Father's forced sobriety in prison, he has a significant history of chemical dependency on alcohol and controlled substances and

3

criminal conduct. This is evidenced by the fact that he was sentenced as a chronic offender[2] following his most recent driving while intoxicated conviction. Additionally, the juvenile court found the testimony that Father had been attending AA and NA meetings while incarcerated to be less than credible. Given Father's past behavior and the record relating to his participation in substance abuse programs, there was evidence to support a finding that the conditions which led to the assumption of the juvenile court's jurisdiction still persist.

Likewise, the record supports a finding that there is little likelihood that Father's substance abuse issues and incarceration will be remedied at an early date so that Child can be returned to Father in the near future. While "incarceration in and of itself shall not be grounds for termination of parental rights," the juvenile court must consider the "conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years" when considering whether to terminate the parent-child relationship for failure to rectify.[3] Section 211.447.7(6).

The juvenile court found that Father's conviction and subsequent incarceration would deprive Child of a stable home because Father could be paroled at the earliest in November 2018 and had been incarcerated since before Child was born. As reasoned by the principal opinion, Child will be almost five years old before Father's incarceration

---

[2] At the time of Father's offense, a "chronic offender" was defined, in part, as a "person who has pleaded guilty to or has been found guilty of four or more intoxication-related traffic offenses." Section 577.023.1(2), RSMo Supp. 2013.

[3] While section 211.447.7(6) permits consideration of a conviction of a felony offense that may deprive a child of a stable home, I question whether it provides that incarceration of a long duration alone is sufficient to support termination.

4

potentially ends in November 2018.  It follows that Father's long history of substance abuse and criminal behavior, his current incarceration, and his extended absence from Child's life make it unlikely that Child could be returned to his custody.

Therefore, the juvenile court's finding that Father's parental rights should be terminated pursuant to section 211.447.5(3) for failure to rectify the conditions that led to the juvenile court assuming jurisdiction over Child is supported by substantial evidence.  I would affirm the juvenile court's judgment terminating Father's parental rights on this basis.

I disagree with the principal opinion to the extent that it concludes that termination of Father's parental rights was also appropriate pursuant to section 211.447.5(6)(a) for parental unfitness.  As reasoned by the dissenting opinion, I would find that the duration of Father's incarceration does not constitute a consistent pattern of committing a specific abuse such that Father is unfit to be a party to the parent-child relationship.  I concur in the principal opinion in all other respects.

_____
PATRICIA BRECKENRIDGE, CHIEF JUSTICE

5



# SUPREME COURT OF MISSOURI
## en banc

IN THE INTEREST OF J.P.B.        )
        )
M.R.S.,        )
        )
      Appellant,        )
        )
v.        )      **No. SC95602**
        )
GREENE COUNTY JUVENILE OFFICE,  )
        )
      Respondent.        )

## DISSENTING OPINION

I respectfully dissent. The majority affirms the trial court's judgment terminating Father's parental rights on the basis that the record shows that Father (1) failed to rectify the conditions that led to the court's taking jurisdiction, and (2) is unfit to be a party to the parent-child relationship because he has been incarcerated since J.P.B.'s birth. The majority says that, while incarceration in itself does not make a parent unfit or constitute a failure to rectify, incarceration for more than a brief period does itself make a parent "unable to care appropriately for Child or provide Child with a safe, stable, and healthy home environment." *Slip op. at 10*. In other words, it holds that the separation of parent and child caused by the incarceration makes the parent unsuitable and unable to rectify conditions leading to jurisdiction over an infant child, even where, as here, relatives of the

parent were available to provide appropriate care pending the parent's release from incarceration. For the reasons discussed below, this is palpably wrong. The court erred in terminating Father's parental rights for failure to rectify and erred in finding him unfit.

### A. *Failure to Rectify Conditions that Led to Jurisdiction of the Court*

The majority says that Father's rights can be terminated for failure to rectify pursuant to section 211.447.5(3), RSMo Supp. 2014, which states that termination is permitted when:

> The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

While all agree that J.P.B. has been under the court's jurisdiction for more than one year, the other elements simply are not met.

Regarding the second element, the majority says that "conditions of a potentially harmful nature continue to exist" because Father, due to his incarceration, is "unable to care appropriately for Child or provide Child with a safe, stable, and healthy home environment."[1] *Slip op. at 10.* But, of course, there are many scenarios in which parents are unable to personally care for a child for a period of time, even for a period of years,

---

[1] The trial court also found neglect by Father, substance abuse, and a failure to engage in services. The majority does not rely on these findings because Father never had custody of the child born after his incarceration, Father has complied with social service requirements, and the evidence does not show substance abuse since his incarceration or that such abuse cannot be treated.

2

without this making the parent unfit or without the parent being found to have failed to care for the child appropriately. Indeed, parents are often separated from children due to illness, military service, work requirements, or for other reasons, including incarceration. These parents' rights are not terminated as a result of that separation, even though the child in each case is separated from the absent parent for a lengthy period, because the parent can arrange for another person, such as a relative, to "provide Child with a safe, stable, and healthy home environment." *See slip op. at 10.*

The majority might respond that this situation is different from others, for here there is no fit spouse to care for Child while Father is incarcerated. This scenario is, in fact, all too common. Even more importantly, it misses the point. The statute does not set a different standard for termination depending on whether a spouse is available as an alternative provider-of-care. Just as care appropriately can be given by one parent in the other's absence, it also can be given by other relatives. Here, Father attempted to arrange for such alternate care when he sought placement of J.P.B. with Child's paternal grandmother.

Section 210.565.1, RSMo Supp. 2013, provides that "[w]henever a child is placed in a foster home and the court has determined pursuant to subsection 4 of this section that foster home placement with relatives is not contrary to the best interest of the child, the children's division shall give foster home placement to relatives of the child." As the majority notes, the trial court found placement with Grandmother was not in J.P.B.'s best interests, and section 210.565.4, RSMo Supp. 2013, provides, "The preference for placement and first consideration for grandparents or preference for placement with other

3

relatives created by this section shall only apply where the court finds that placement with such grandparents or other relatives is not contrary to the best interest of the child considering all circumstances." But the majority fails to explain *why* the trial court so held. [2] It was not because the trial court found placement with Grandmother was inappropriate. To the contrary, the home study completed in August 2015, before Father's rights were terminated, found Grandmother was an appropriate placement for J.P.B., and the Children's Division recommended placing J.P.B. with Grandmother. Further, the court's order denying placement with Grandmother found that, after learning of J.P.B's birth in September 2014, Grandmother requested visitation in October 2014 and had been granted visitation beginning in November 2014. She requested placement of J.P.B. with

---

[2] The majority suggests that the Court is not to consider placement with Grandmother because Father did not "directly challenge" the trial court's order denying placement with Grandmother as part of this appeal. *But the trial court's order denying Father's motion for placement is not a part of the case at hand*, which deals solely with whether to terminate Father's parental rights. Instead, it is part of J.P.B.'s underlying custody case, which is still ongoing and lacks a final appealable judgment. Of course, this appeal is of the ruling in the termination of parental rights case, not the ongoing custody case. The confusion of the majority may be caused by the fact that the trial court informed Father before the beginning of the hearing of evidence in this termination of parental rights case that the court was going to enter an order denying his motion for placement with Grandmother later that same day, but it was so doing *in the custody case*. Father's attorney did all he could by requesting a continuance of the termination action so that he could attempt to seek review of the trial court's order denying placement in the custody case. The motion for continuance was denied, and the trial resumed. Father could not appeal that custody case ruling in the instant termination action. Nor, it appears, could he have sought interlocutory review of the ruling in the custody case either, as appeals are allowed only of a final judgment, order, or decree. §§ *211.261.1; 210.720.1. See In re A.N.L. v. Maries Cnty Juvenile Office, 484 S.W.3d 328, 333-34 (Mo. App. 2016); In re T.G.O., 360 S.W.3d 355, 356 (Mo. App. 2012)* (no right to appeal non-final order denying foster placement with relative). Father has done what he reasonably could by indirectly challenging the trial court's denial of placement with Grandmother in his petition in this Court.

4

her at that time and a home study was begun. The home study was suspended because it was thought that a cousin would be able to provide care for J.P.B., but when the cousin had to move out of state, Grandmother again requested a home study. During this period, Grandmother had many visits with J.P.B. and developed a loving and bonded relationship with him, as the trial court specifically found:

> Visits between [Grandmother] and the minor child increased over time with [Grandmother], at the time of the hearing of the motion, receiving overnight and weekend visits with the minor child. [Grandmother] has been consistent with visiting the child and there was no evidence presented to suggest that the visits between her and her grandson were inappropriate. By all accounts, the minor child enjoys his visits with [Grandmother] and refers to her as his grandma. The [foster] family and [Grandmother] get along well together and have coordinated [Grandmother's] visits with the minor child for a significant period of time.

Why, then, did the trial court find that it was not in the best interests of J.P.B. to be placed with Grandmother? Not because placement with Grandmother was inappropriate, but because J.P.B. had bonded with his foster family since being placed with them the prior year. And, no doubt, the record shows that the foster parents are fine parents and would provide a good home for J.P.B. But it is circular to deny visitation to Father and then justify a finding of lack of best interests in placing J.P.B. with Grandmother with the fact that the preference for placement with relatives was ignored for a sufficient length of time that J.P.B. has, in the interim, bonded with the foster parents.

In any event, even were placement with the foster parents in the best interests of J.P.B. – a questionable finding considering Grandmother's bonding with J.P.B. and the statutory preference for placement with a relative under section 210.565.1 – this cannot provide a basis for finding a failure to rectify. To do that, the court first must have found

5

that Father failed to provide appropriate care for J.P.B., and because Grandmother was found to be an appropriate placement, that finding is not supported and the best interests analysis should never have been reached.

By finding a failure to rectify despite Grandmother's appropriateness, the court is effectively finding that placing a child in the care of a loving relative is not sufficient to constitute appropriate care. This makes a huge percentage of children in this state subject to being removed from their grandparents, who are now caring for them, and placed in foster care pending termination of their parents' rights for failure to rectify. Of course, the majority would not condone any such actions, for grandparents and other relatives are well able to care appropriately for their grandchildren during a parent's temporary absence. It is Father's incarceration that the majority really is saying makes Father unfit. Yet section 211.447.7, RSMo Supp. 2014, makes it clear that incarceration itself cannot provide a basis for finding a failure to rectify. It provides:

> When considering whether to terminate the parent-child relationship pursuant to subsection 2 or 4 of this section or subdivision (1), (2), (3) or (4) of subsection 5 of this section [a court may consider]
> . . . .
> (6) *The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights*

(emphasis added).

The majority tries to use the four-year length of Father's incarceration to say that J.P.B. will be deprived of a stable home for a period of years, so that the third element of failure to rectify is present both because "there is little likelihood that [the harmful]

6

conditions will be remedied at an early date so that the child can be returned to the parent in the near future" and because "the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home." Again, this finding ignores that Grandmother is bonded with J.P.B. and can provide a stable home for him until Father is released, and that Father is eligible for release in just two years.

In effect, the majority is adding an unstated additional phrase to section 211.447.7(6): that incarceration for more than a short period is a basis for termination if the child is an infant at the time of incarceration. This is not what the statute says, however, and the majority's holding simply pays lip service to the provision that incarceration cannot provide a basis for termination. It means in reality that a large percentage of those incarcerated will be subject to having their parental rights terminated even though they had appropriately cared for their child and would be released from prison while their child was still at a young age.

Moreover, the majority is wrong in saying that J.P.B. cannot start to develop a relationship with his Father until Father's release. Were J.P.B. placed with Grandmother instead of with a non-relative foster family, then Father could begin to develop the family bonding and relationship that he has been denied the opportunity to develop because of the trial court's denial of visitation with him by J.P.B., despite Father's repeated requests for visitation. This is particularly appropriate here, as the record shows that Grandmother and J.P.B. are bonded, that Father will be eligible for parole in November 2018, that he already was incarcerated when J.P.B. was born, that ever since learning of J.P.B.'s birth Father has

7

attempted to obtain visitation, that he writes two or three letters to J.P.B. each month, and that he has provided J.P.B. with every ordered child-support payment.

The trial court's refusal to allow such visitation creates a self-fulfilling disqualification; it denies visitation because Father is incarcerated and then directs termination of parental rights because Father and J.P.B. are not visiting. Denial of visitation is not intended to be used as a wedge to keep parents and children apart and should not be used as a justification for termination of parental rights based on the lack of bonding caused by this artificial and subjective decision to separate the family.[3]

The majority states that Father's efforts are not enough, noting that section 211.447.8, RSMo Supp. 2014, provides, "The court may attach little or no weight to infrequent visitations, communications, or contributions." The context in which the visitations, communications, and contributions necessarily must be considered here, however, cannot be counted against Father. Father presented evidence that because he earns only $8 per month in prison, Child Support Enforcement permitted him to pay only $2 per month and would not allow him to pay any additional support. Father has communicated in the only way he has available, by letter, and has continued to attempt to obtain the right to in-person visits and bonding.

The majority is wrong in suggesting that Father somehow has forfeited his parental rights and has justified ignoring his substantial efforts to obtain visitation with J.P.B.

---

[3] That is particularly true where, as here, the misconduct that led to Father's incarceration occurred before he knew of his son's existence; he cannot, therefore, be accused of choosing a criminal way of life with the knowledge that it would lead to separation from his son.

8

because he did not appeal denial of visitation here directly. This is the termination of parental rights case. The denial of visitation was ordered in the custody case. I strongly doubt the majority is really intending to adopt a rule that requires parties to raise on appeal of a termination case errors made by a trial court in ruling on visitation and placement issues *in a separate custody action*. That certainly would be a first. Neither the visitation nor the placement orders were entered in this case, and neither could be appealed here.

Further, even were the custody case relevant here, the majority ignores Father's substantial other efforts to ensure physical visitation with Child after the trial court denied Father's first motion for physical visitation. He first tried to arrange for an alternative to physical visitation, such as through Skype, which the trial court indicated it would approve, but the Department of Corrections said it was unable to provide Father with the tools to videoconference with the one-year-old. Father then filed a second motion for physical visitation due to the failure of this alternative but again was denied in-person visitation.

Like the court's first ruling denying physical visitation, even were an interlocutory appeal of the second ruling allowed, it would have been unlikely to have brought Father relief because it was inherently interlocutory and could be revisited where, as here, the *only* reason the trial court denied visitation was because of the distance between Father and J.P.B., rather than any finding of inappropriateness of contact between them. That no doubt is why section 211.261.1, RSMo 2000, allows appeals only of "final judgments, orders and decrees." *See also In re A.N.L., 484 S.W.3d at 333-34*; *In re T.G.O., 360 S.W.3d at 356* (no right to appeal non-final order denying foster placement with relative). The majority suggests that he could have "appealed" by seeking a writ as to this order or as to the order

9

on placement (despite being entered in a different lawsuit), and was unreasonable in failing to do so; no authority is cited because, of course, one is never required to seek a writ, that is why a writ is described as "extraordinary" relief.

In sum, Father cannot seek visitation in a termination case and so could not appeal a denial of that visitation here, but even so the record shows he made all reasonable attempts to obtain visitation, and the record does not show that Father is unable to appropriately care for J.P.B. or that the continuation of the parent-child relationship diminishes the likelihood of early integration of J.P.B. into a stable home. The record, therefore, does not support the trial court's finding of a failure to rectify.

### B. Finding of Unfitness under Section 211.447.5(6)(a)

The majority notes that the bar on consideration of the fact that the parent is incarcerated does not expressly apply to termination under section 211.447.5(6)(a), which governs termination when the parent is unfit to be a parent. Contrary to the majority's truly startling reading of the word "abuse" as used in that provision, however, this section does not provide a ground for termination. Section 211.447.5(6)(a) states in relevant part that parental rights may be terminated when:

> The parent is unfit to be a party to the parent and child relationship *because of a consistent pattern of committing a specific abuse* including, but not limited to, specific conditions directly relating to the parent and child relationship which are determined by the court to be of a duration or nature that *renders the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of the child.*

*Id.* (emphasis added).

10

The majority admits that Father has not abused J.P.B. – indeed, he has never been permitted contact with J.P.B. and is not accused of ever having abused any child or person. The majority says that this subsection nonetheless justifies termination of Father's parental rights because by stating that a "specific abuse" can include "specific conditions" that are "of a duration or nature that renders the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental or emotional needs of the child," the legislature has defined being unable to care "appropriately" for one's child for the foreseeable future as a kind of "specific abuse." *Slip op. at 14-15.*

First, even under the majority's reading of the statute, termination is unjustified. As already noted, it is quite foreseeable that Father will be eligible for parole in two years. Further, the evidence shows that Grandmother is ready, willing, and able to care for J.P.B. in the interim, and nothing about that care is shown to be inappropriate. Indeed, Father has never been found to be unfit to visit with his son, and if Grandmother were to receive custody, he could begin to form the bond that he has so anxiously and continuously fought to forge over the last two years to no avail.

Second, the majority's reading of the statute simply is wrong. It tries to make sense out of including incarceration within the definition of the statute's requirement that the state show "a consistent pattern of abuse" by parsing through the language of the statute prior to the 2014 amendment and comparing it to the statute as it stands today. But whatever reason the legislature may have had for leaving in the words "including, but not limited to" when it revised the statute, nothing suggests it made the change to include cases, such as this, when there is no "consistent pattern of committing a specific abuse," a phrase the

11

legislature also kept.  It is far more logical to interpret the language to mean what it says –

that if there are specific conditions of a relationship of parent and child that are abusive,

and if they occur sufficiently repeatedly to constitute a pattern, and there is reason to

believe that pattern will continue, then the statute applies.  It is illogical to read it to convert

a continuing non-abusive aspect of a parent-child relationship into a form of abuse, whether

as one instance of abuse or as a pattern.  There must be a specific abuse, and a consistent

pattern of such abuse.

Here, Father is not accused of committing any abuse at all, much less a pattern of

abuse.  Being in prison when your child is born is neither abuse nor a pattern of abuse.

Further, being in prison does not preclude a parent from caring for a child appropriately.

If Father is unfit despite taking all possible measures to be with his child – and no one has

identified other reasonable measures he could have undertaken – then so would be most

fathers and mothers sent to a prison not located conveniently to their infant children's

location.  Our juvenile divisions would be remiss in not moving for such termination as to

all parents, for according to the majority, incarceration constitutes a consistent pattern of

specific abuse.  Of course, this is not the case.

Equally importantly, to read the statute in that manner puts it in conflict with section

211.447.7(6), which the majority acknowledges does not permit incarceration to form the

basis for termination so long as it does not preclude a stable home for a period of years.

While the majority says that this subsection does not apply to termination for specific abuse

under section 211.447.5(6)(a), in this context the abuse is the incarceration, and so in any

case of incarceration for more than a couple of years, the incarceration itself would provide

12

the basis for termination. The protection provided by section 211.447.7(6) would be worthless if incarceration itself provides a separate basis for termination under a different subsection. This Court should not interpret a statutory provision such that it would render other provisions meaningless. *See Wollard v. City of Kansas City, 831 S.W.2d 200, 203 (Mo. banc 1992)* ("The legislature is presumed not to enact meaningless provisions."); *Denbow v. State, 309 S.W.3d 831, 835 (Mo. App. 2010)* (refusing to interpret a statutory provision in a way that would render another provision of the same section meaningless).

To suggest that incarceration is not the reason for termination of Father's parental rights is doublespeak. Of course it is the reason. For all of these reasons, I would hold that neither section 211.447.5(3) nor section 211.447.5(6)(a) provides a basis to terminate Father's parental rights.

### C. Inability to Communicate with Counsel During Hearing

I agree with the majority that there is no constitutional right to appear in person at a civil trial. *Call v. Heard, 925 S.W.2d 840, 846 (Mo. banc 1996).* It was within the trial court's discretion to deny Father's request under § 491.230.2(1) to attend the trial in person. *Beckwith v. Giles, 32 S.W.3d 659, 663 (Mo. App. 2000).* But there is no question that a prison must not unduly interfere with a prisoner's constitutional right to access the courts. *Call, 925 S.W.2d at 846.* As this Court noted in *Call*, the right to access courts does not mean the prisoner is entitled to "perfect access," but it does entitle the prisoner to "meaningful access." *Id.* This includes access to counsel, the majority acknowledges, for "pursuant to § 211.462.2, a natural parent has a statutory right to counsel in a termination of parental rights proceeding and, therefore, an implied right to effective assistance of

13

counsel." *Slip op. at 18-19, citing C.V.E. v. Greene Cnty. Juvenile Office, 330 S.W.3d 560, 574 (Mo. App. 2010).*

"Meaningful access" can be through "significant alternatives," including video conferencing, which can provide "constitutionally sufficient access…by means other than the live presence at trial of the person in question." *Call, 925 S.W.2d at 846; see also McNeal v. McNeal-Sydnor, 472 S.W.3d 194, 197 (Mo. banc 2015).* But it must still remain "constitutionally sufficient." Videoconferencing that does not allow the prisoner to communicate with counsel privately during trial is not an adequate alternative to the prisoner's presence at trial. There is no reason that Father should be denied a right that all others have at trial – meaningful confidential access to counsel.

"[C]onfidentiality of the communications between client and attorney is essential for such relationships to be fostered and effective." *State ex rel. Great Am. Ins. Co. v. Smith, 574 S.W.2d 379, 383 (Mo. banc 1978).* As the Ninth Circuit found:

> [I]t is well established that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him. It takes no stretch of imagination to see how an inmate would be reluctant to confide in his lawyer about the facts of the crime, perhaps other crimes, possible plea bargains, and the intimate details of his own life and his family members' lives, if he knows that a guard is going to be privy to them, too.

*Nordstrom v. Ryan, 762 F.3d 903, 910 (9th Cir. 2014)* (internal quotation and citations omitted).[4]

---

[4] *See Coplon v. United States, 191 F.2d 749, 757 (D.C. Cir. 1951)*; *see also Johnson-El v. Schoemehl, 878 F.2d 1043, 1052-53 (8th Cir. 1989)* ("[P]laintiffs allege that they were only allowed to meet with their attorneys in public areas of the Jail where their conversations could be overheard by guards and other prisoners. … Such conditions impeded the detainees' ability to prepare for trial, jeopardize confidentiality of their

14

While Father was permitted to attend the trial by video conference, his counsel was in the courtroom. They did not have a hookup that allowed them so speak privately; even when the courtroom was cleared on occasion to allow communication, that communication was not private because a guard and another person were present in the video-conferencing room with Father at all times. This is not what *Call* meant by "constitutionally sufficient access." If this matter were remanded for further proceedings, and in any similar hearings for Father or other parents, the trial court should ensure that the person participating by video conference is provided the necessary means for private, confidential communications with counsel during the hearing.

For the reasons set out above, I would reverse the termination of Father's parental rights.

_____
**LAURA DENVIR STITH, JUDGE**

---

attorney-client communications and invade their right to privacy.") (internal quotation and citations omitted); *Adams v. Carlson, 488 F.2d 619, 631 (7th Cir. 1973)* ("[P]rotection of access to counsel requires that the traditional privacy of the lawyer-client relationship be implemented in the prison context.").